# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| JEWEL UPSHAW, Individually and as the Personal Representative for the Estate of ZENA RAY UPSHAW a/k/a ZENA R. UPSHAW, ZENA UPSHAW and ZENA "ZEKE" UPSHAW, Deceased, | No. 2:18-cv-13301 |
| Plaintiff, | COMPLAINT FOR DAMAGES |
| v. | **JURY DEMAND** |
| NATIONAL BASKETBALL ASSOCIATION, DETROIT PISTONS BASKETBALL COMPANY, SSJ GROUP, LLC, and THE DELTAPLEX ARENA, | |
| Defendants. | |

## COMPLAINT AND DEMAND FOR JURY TRIAL

NOW COMES Plaintiff Jewel Upshaw ("Plaintiff"), Individually and as Personal Representative for the Estate of Zena Ray Upshaw a/k/a Zena R. Upshaw, Zena Upshaw, and Zena "Zeke" Upshaw, Deceased, by and through her attorneys and hereby complains of Defendants National Basketball Association ("NBA"), Detroit Pistons Basketball Company, SSJ Group, LLC, and The DeltaPlex Arena (collectively "Defendants"), and in support thereof will show the Honorable Court as follows:

### INTRODUCTION

1.    The NBA is one of the world's most profitable organizations, raking in billions of dollars annually as a result of the popularity of its teams and their players. In fact, each NBA team enjoys a value of over one billion dollars. The NBA is, at every level, a lucrative business model

for the league itself, for the individual teams, for the league's developmental teams, and for the venues paid to host and manage events. However, there exists a tragically unaddressed secret inside the NBA: the well-known and serious risk to the league's young stars suffering a sudden cardiac event during a game. The NBA knows that the risk of player death due to a sudden cardiac event during any given game is present at every level of its multi-leveled league; that is, the risk of suffering a sudden cardiac event affects players from the top level itself (its thirty NBA franchise teams like the Golden State Warriors and the Los Angeles Lakers), to the premier "G-Level" development teams (its twenty-six NBA "G League" teams, like the Maine Red Claws (the Boston Celtics' NBA G League team), and the Rio Grande Valley Vipers (the Houston Rockets' NBA G League team). The NBA knows, should one of its players suffer a sudden cardiac event during a game—and that player's life-threatening condition is not addressed rapidly, accurately, and effectively by properly trained medical personnel—then death will follow. The NBA is fully aware that this is a critical and widespread medical issue within the world of basketball, and moreover, that its response to the onset of sudden cardiac event symptoms must be quick and immediate in order to be effective.  No one is immune, including multiple MVP winner LeBron James with the Los Angeles Lakers, or Zeke Upshaw, a dedicated, well-loved, rising star enjoying one of his best seasons as a point guard for the Detroit Pistons' NBA G League team, the Grand Rapids Drive.

2.     The NBA has known of the risk of sudden cardiac death in players since at least 1993 (and likely long before) when NBA star Reggie Lewis suffered Sudden Cardiac Death on the basketball court at an off-season practice at the age of 27 (just one year older than the deceased in this case, Zeke Upshaw).  The NBA is and has been aware of the many similar and tragic sudden cardiac events resulting in death in seemingly healthy athletes while playing at all levels of organized basketball (e.g., NBA, NCAA, AAU, and high school) for decades; including, most

recently, the death of 17-year-old high school phenom and AAU standout James Hampton, who collapsed during a basketball game and died shortly thereafter. Yet, the NBA still fails to adequately prepare for and protect its league players from the risk of sudden cardiac death. This, despite knowing with absolute certainty that a sudden cardiac event will result in the death of a player if that event is not properly recognized, quickly identified, and aggressively addressed with specific treatment that is both immediate and appropriate. The NBA's policy is startlingly poor, and its every day preparation and enforcement during the long basketball season, at every level of team play, for every single team and every individual player is dangerous, life-threatening, haphazard and inconsistent.

3.     It is against this iniquitous backdrop that Plaintiff, Jewel Upshaw, brings these present claims, with a mother's sad and broken heart.  These claims arise and stem from the sudden, tragic, and wholly preventable death of her son, Number "0," Zeke Upshaw, as a direct result of the wrongful conduct and omissions of the Defendants named in this litigation.  It is Ms. Upshaw's hope that through her lawsuit, change will come to the NBA—that moving forward, not one more NBA son of a proud mother will ever again so needlessly suffer sudden cardiac death during a basketball game.  Instead, if that son experiences a sudden cardiac event while playing for the NBA, it will be accurately identified and confirmed immediately.  That son will be treated and saved by well-trained and quick response teams, i.e., properly trained individuals who are following detailed, robust and lifesaving implementation of written policies and procedures that have been practiced and perfected. The NBA's quick and accurate recognition of a life-threatening, sudden cardiac event at the moment it occurs, coupled with an immediate and appropriate response, ensures the best outcome and highest survival rate for its players.

3

## JURISDICTION AND VENUE

4.     This Court has jurisdiction over the subject matter of this claim pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is a civil action in which the parties are citizens of different states.

5.     Pursuant to 28 U.S.C. § 1391(b)(1), proper venue for this action is the United States District Court for the Eastern District of Michigan because at least one Defendant, Detroit Pistons Basketball Company, resides in this district, and each of the Defendants reside in the State of Michigan, pursuant to § 1391(d).

6.     This Court has general personal jurisdiction over Defendants because Defendants conduct continuous and systematic business in Michigan and certain conduct giving rise to the claims in this Complaint took place in Michigan. Furthermore, Defendants Detroit Pistons Basketball Company, SSJ Group, LLC, and DeltaPlex Arena are citizens of Michigan and Michigan courts can exercise specific personal jurisdiction over all Defendants pursuant to Mich. Comp. Laws Ann. § 600.715.

## PARTIES

7.     Plaintiff, Jewel Upshaw, is an individual residing in Clark County, Nevada, is the biological mother of the deceased, Zeke Upshaw, and is the Personal Representative for the Estate of Zena Ray Upshaw a/k/a Zena R. Upshaw, Zena Upshaw, and Zena "Zeke" Upshaw.

8.     Defendant, National Basketball Association (hereinafter referred to as "NBA"), is a corporation organized and existing under the laws of the State of New York, and having a principal place of business located at 645 Fifth Avenue, Olympic Tower, New York, NY 10022.

4

9.      Defendant, Detroit Pistons Basketball Company (hereinafter referred to as "Pistons"), is a corporation organized and existing under the laws of the State of Michigan, and has a principal place of business located at 5 Championship Drive, Auburn Hills, MI  48326.

10.     Defendant, SSJ Group, LLC (hereinafter referred to as "SSJ"), is a limited liability company organized and existing under the laws of the State of Michigan, and has its principal place of business located at 338 Baldwin Road, Birmingham, MI  48009.

11.     Defendant, The DeltaPlex Arena (hereinafter "DeltaPlex"), is a building owned and operated by its president, Joel Langlois, and has its principal place of business located at 2500 Turner Avenue Northwest, Grand Rapids, MI  49544.

## FACTS RELEVANT TO ALL CLAIMS

12.     Zeke Upshaw was born in Chicago, Illinois, where he grew up playing and loving the game of basketball, becoming one of the city's best young players and starting for his high school team at University of Chicago Laboratory Schools.

13.     After graduating from high school, Zeke went on to play at Illinois State University, earning his bachelor's degree in 2013. Having red-shirted his freshman year, Zeke played his final remaining year of eligibility at Hofstra University as a graduate student, where he took over as the star and captain of the team.   Zeke finished at Hofstra with a master's degree in education.

14.     Zeke, determined to follow his heart and his love for the game, declared for the 2014 NBA Draft.  Undeterred by his undrafted status, he decided not to play in the NBA minor leagues, the D-League (now renamed the NBA G League) and, instead, went to play ball overseas, joining the Helios Suns team of the Premier A Slovenian Basketball League in September 2014. In 2015, he joined and played for Basket Esch's team in the Luxembourg's Total League.

5

15.     Zeke, homesick and ready to bring his improved game to the NBA, returned to the United States and entered the 2016 NBA Development League Draft. Excitement filled the Upshaw home and pride swelled in Jewel Upshaw's heart as her boy, Zeke, was selected in the fourth round by the Grand Rapids Drive team out of Michigan.  Zeke excelled with the team, and in the months leading up to his death, Detroit Pistons General Manager, Jeff Bower, professed to Zeke's agent how he "ha[d] been really happy for Zeke and the improvement he has shown . . . [t]his has been a good experience and the results speak to the effort that has been invested [by Zeke]." Bower went on to say that they "will be discussing these things later in the spring," presumably referring to Zeke moving up to the Detroit Pistons. Unfortunately, spring never came for Zeke.

16.     On March 24, 2018, Zeke was playing in his second full season for the Drive. Donning the Number "0," point guard Zeke Upshaw was considered a hard-working player with quick moves, a silky three, and strong defensive skills.  He was well thought of by his Drive teammates, coaches, and management, and loved by Grand Rapids Drive fans.  At 26 years old, Zeke played his most solid NBA G League season yet, and on this particular Saturday night—the last game of the team's regular season—the fourth-quarter clock was winding down at the DeltaPlex Arena & Conference Center.  In the final minute of the game, Zeke had already scored 11 points, and was defending his player "man-to-man" during a mid-court inbound pass.  Zeke broke through an offensive screen and trailed his man to the sideline.  While his man stood near the 3-point line and Zeke was guarding him, with his knees and arms bent in a familiar defensive posture, Zeke—untouched—suddenly collapsed to the floor. He laid where he fell, lying face-down and motionless on the court.  His arms were twisted in the awkward, unnatural position that occurs when the lifeless limbs of an unconscious person fall with the body to the ground.  No

movement can be seen from that point forward.  Zeke's heart had stopped.  At that moment, with no heartbeat, if Zeke were to be brought back to life, it was imperative that emergency lifesaving treatment begin immediately.  But no such efforts were made.

17.     After Zeke collapsed, the referee whistled to stop play seconds later.  It was immediately clear to all in attendance that Zeke, lying face down on the floor, his arms splayed and unmoving, was unconscious.  What was not considered, but what should have been just as clear, however, was that Zeke was in an extreme and sudden life-threatening medical situation, with no pulse. Though this was certainly a sudden event, happening at the end of the last game of the season, it was not a situation that was surprising or unexpected, as sudden cardiac events and cardiac arrest are on the top of the triage check list for properly trained emergency medical personnel faced with an unconscious athlete who has not suffered any apparent blow or injury.  In fact, properly trained emergency personnel have long been taught to triage for and *expeditiously* rule in or rule out the most life-threatening possibilities first, cardiac arrest being at the top of that list.

18.     Upon information and belief, the Drive's team doctor had stepped out before the end of the basketball game and was not present nor available when Zeke collapsed, and he conveyed this information to Ms. Upshaw at the hospital.

19.     In any event, for nearly ***four minutes***, the team's medical staff and personnel moved around and near Zeke's body as it lay motionless on the court, during which time no sense of urgency can be observed from those kneeling around him, or from those walking towards or away from him; on the contrary, there appeared to be uncertainty, indecisiveness, and a complete and utter lack of appreciation for the severity of the moment as the basketball player's life silently slipped away on the hardwood floor in front of them.  Remarkably, for much longer than four full

minutes, no cardio-pulmonary resuscitation ("CPR") was initiated, no chest compressions were started, no oxygen mask was placed on his nose and mouth, no airway was cleared and secured, and no defibrillator sensors and electric delivery patches were attached and secured to Zeke's chest.  (If Zeke had a heartbeat, the defibrillator sensor's fail safe design would not have delivered a charge—but as Zeke did not have a heartbeat, the defibrillator, if used, may have very well immediately re-started Zeke's heart.)  In fact, ***not a single life-saving measure was administered during the entire four minutes of the tragic event's video recording***.

20.    Moreover, the video confirms that desperate courtside team fans were frantically gesturing to medical staff to "hurry-up" after the fans watched for the first minute-and-a-half and observed the casual inaction by those who were in charge of making life-saving decisions.

21.     Toward the end of the aforementioned video recording, a portable stretcher can be seen being slowly and casually wheeled onto the court, where, though not captured on the video, Zeke's body was collected and wheeled off.

22.    Somehow—***abhorrently***—confirmed  by a hospital cardiologist, Zeke's body went without oxygen for another ***forty minutes*** after the end of the video, leaving his brain completely oxygen-deprived for a full ***forty-four minutes*** in total.  At this point, there was no healthy brain left to save.

23.    Despite the undeniably dire life or death situation, where every single second mattered and "the golden five minutes" (that first five minutes—the limited time doctors know is critical in delivering effective lifesaving care during a sudden cardiac event, after which brain damage begins) quickly passes, Zeke Upshaw, improperly attended, was left to lie unconscious on the hardwood, in his team's full uniform, slowly dying as his otherwise healthy heart remained unbeating in his chest.  Zeke Upshaw's heart only needed a compression series, or a charged

delivery from a defibrillator, to begin to pound again and to pump blood and life back into his motionless body.  However, according to witnesses, *no one* ever attempted to revive him.

24.     Zeke was taken, unresponsive, to the Spectrum Health Butterworth Campus Emergency Room and placed in the Intensive Care Unit.   Doctors determined that he had approximately 20-percent brain functionality left—in other words, he was effectively "brain dead" upon arrival.  As a result of Zeke's continuing unresponsive state and his prognosis of a clear medical "downhill course," his family instructed that he be placed on "comfort care."  Two days later, Zeke Upshaw was pronounced dead.

25.     The Grand Rapids Drive is a Gatorade League ("G League") team.  The NBA G League, formerly known as the "D-League," is the NBA's official minor league, preparing players, coaches, officials, trainers, and front-office staff for the rigors NBA competition and performance, while acting simultaneously as the league's research and development laboratory.[1]  The NBA G League features twenty-six teams, all with one-to-one affiliations with NBA franchises and games airing on Facebook Live, ELEVEN SPORTS, Twitch, NBA TV, and ESPNU.[2]

26.     According to the NBA G League website, an all-time high of 265 players with NBA G League experience were on NBA rosters at the end of the 2017-18 regular season, representing 53 percent of the league.[3]  At least thirty NBA G League prospects have been called up to the NBA in each of the past seven seasons.

27.     The NBA G League is made up of teams either owned directly by NBA franchises or individually owned by private companies.  Some teams, like the Grand Rapids Drive, are owned in a hybrid structure where an NBA team (here, the Detroit Pistons), as well as a private company,

---

[1] http://gleague.nba.com/faq/.

[2] *Id.*

[3] *Id.*

(here, SSJ Group, LLC) own this minor league/development team. In this case, the Grand Rapids Drive are jointly owned, operated, and controlled by both the Detroit Pistons Basketball Company and SSJ Group, LLC. The Grand Rapids Drive play all their home basketball games in the DeltaPlex Arena where Zeke suffered his fatal, sudden, cardiac event.

28.     Defendants failed Zeke by not having proper medical staff in the arena to prevent injuries and deaths such as his, and failed to properly train team staff and employees on how to respond to sudden cardiac events like this one.

29.     Plaintiff alleges, among other things, that Defendants caused Zeke Upshaw's wrongful death by the negligent hiring and training of staff and employees, by the unnecessary, unreasonable, and grossly negligent delays in providing and administering medical care and treatment to Zeke Upshaw.  Defendants also failed to implement and provide the Grand Rapids Drive G League team the resources, policies, and procedures reasonably necessary to prevent, treat, and assist them during this foreseeable medical emergency.

30.     As a direct result of the death of Zeke Upshaw on March 26, 2018, which was caused by the negligence, carelessness and recklessness of the Defendants NBA, Pistons, SSJ and DeltaPlex, by its duly authorized agents, servants, and/or employees, Zeke Upshaw sustained serious injuries and substantial economic loss.

31.     Plaintiff and the Estate of Zeke Upshaw, deceased, have sustained various injuries, charges and damages as a result of the negligence, carelessness and recklessness herein which caused Zeke's death, and demand recovery for their losses and damages.

32.     As a consequence, the Estate and Plaintiff have sustained damages in an amount exceeding the jurisdictional limitations of all lower courts which would have jurisdiction over this case.

33.     Defendants have witnessed tragedies such as Zeke's time and again over the years, where current and former NBA or NCAA basketball players die prematurely from sudden catastrophic cardiac events, making Zeke's death all the more foreseeable and therefore preventable.

34.     For example, in 1990, 23-year-old Hank Gathers collapsed while playing a basketball game at Loyola Marymount University.  Teammates described him as "an unbelievable physical specimen," yet he passed well before his time in a massive and sudden cardiac event on the basketball court.[4]

35.     In 1993, 27-year-old Boston Celtics player Reggie Lewis died after what doctors referred to as a "heart ailment" caused him to collapse on the court during practice.[5]

36.     In 2000, 29-year-old Orlando Magic summer league player Conrad McRae experienced Sudden Cardiac Death while running wind sprints during the team's practice and collapsed on the court; he was pronounced dead shortly thereafter.[6]

37.     The NBA has seen the sudden cardiac death trend through off-the-court incidents as well. For example, in October 2005, 28-year-old Atlanta Hawks center Jason Collier died of a "sudden heart-rhythm disturbance" while in his home during the off-season.[7]  In 2011, 34-year-old Robert Traylor, a former NBA player described by others as a "gentle giant," died of a massive

---

[4] Bill Dwyre, *25 Years After It Happened, Hank Gathers' Death Still Brings a Shudder*, LOS ANGELES TIMES, Mar. 4, 2015, available at http://www.latimes.com/sports/la-sp-hank-gathers-dwyre-20150304-column.html (last accessed May 29, 2018).

[5] *See* Robert M. Thomas, Jr., *PRO BASKETBALL; Celtics' Lewis Dies After Collapsing in a Gym*, NEW YORK TIMES, Jul. 28, 1993, available at https://www.nytimes.com/1993/07/28/sports/pro-basketball-celtics-lewis-dies-after-collapsing-in-a-gym.html (last accessed May 29, 2018).

[6] Paul McLeod, *No Reason Found for McRae's Death*, LOS ANGELES TIMES, Jul. 12, 2000, available at http://articles.latimes.com/2000/jul/12/sports/sp-51758 (last accessed May 29, 2018).

[7] AP, *PRO BASKETBALL; Collier Had Enlarged Heart*," NEW YORK TIMES, Nov. 2, 2005, available at https://www.nytimes.com/2005/11/02/sports/pro-basketball-collier-had-enlarged-heart.html (last accessed May 29, 2018).

heart attack while in his home.[8]   In June 2016, 46-year-old Sean Rooks, a 14-year NBA veteran

who "was in very good shape"[9] and had "interviewed for an assistant coach job with the New York

Knicks hours before his death and recently had been offered the Charlotte Hornets' D-League head

coach job",[10] passed away from Sudden Cardiac Death, one of many tragedies in a chain of

"disturbing" NBA player deaths "[where] guys seem to be healthy and just pass way too soon."[11]

38.     Even with the steps the NBA has taken very recently requiring heart testing each

season, that testing has only *further* underscored the magnitude of the problem.   For example,

according to a December 2017 study published by the Journal of the American Medical

Association ("JAMA"), scientists analyzed heart data from 519 NBA athletes and determined that,

using the most recent set of athlete-specific criteria, 81 players had abnormal results, despite the

players' "healthy" medical prognoses.[12]   Indeed, the study indicates that the echocardiogram

testing currently in place needs to be individualized for the sport and that there needs to be research

into other kinds of diagnostic criteria, particularly in light of the epidemic of heart-related NBA

deaths.[13]

39.     According to the 2017 JAMA article, the root of the heart disease problem seems

to be the physical training associated with being a basketball player, a problem which doctors in

---

[8]   AP, *Robert 'Tractor' Traylor Found Dead*, ESPN.COM, May 12, 2011, available at http://www.espn.com/nba/news/story?id=6527372 (last accessed May 29, 2018).

[9] Marc J. Spears, *The NBA Seeks to Address a Spiking Problem with Heart Disease*, THEUNDEFEATED.COM, Jun. 9, 2016, available at https://theundefeated.com/features/the-nba-seeks-to-address-a-spiking-problem-with-heart-disease/ (last accessed May 29, 2018).

[10] *Id.*

[11] *Id.* (quoting Golden State Warriors assistant coach and former NBA player Jarron Collins).

[12] Waase MP, Mutharasan RK, Whang W, *et al.*, *Electrocardiographic Findings in National Basketball Association Athletes*, JOURNAL OF THE AMERICAN MEDICAL ASSOCIATION, 2018;3(1):69–74, available at https://jamanetwork.com/journals/jamacardiology/article-abstract/2665180 (last accessed May 29, 2018).

[13] *See* Angela Chen, *Surprisingly High Number of NBA Players Have Abnormal Heart Scans*, THEVERGE.COM, Dec. 6, 2017, available at https://www.theverge.com/2017/12/6/16741580/national-basketball-association-sports-heart-disease-safety-training (last accessed May 29, 2018).

the NBA "have known . . . for a while."[14] In fact, "[a]pproximately 20 [percent] of today's basketball stars have abnormal heart scans . . . [and b]asketball players are 30 times more likely than any other [person] to suffer a sudden cardiac death."[15]

40.     The magnitude of the problem spans across multiple sports groups and multiple levels of athletic play.  In a study performed by the National Center for Catastrophic Sport Injury Research at the University of North Carolina at Chapel Hill ("NCCSIR"), researchers found that from July 1, 2015 through June 30, 2016, there were a total of 112 catastrophic injuries/illnesses captured by NCCSIR among high school and college organized sport participants, all of them cardiac-related. Of these, 101 events were *due to* or *occurred during* sport-related activities.  There were also 11 catastrophic events that occurred during non-sport related activity.[16]  Notably, basketball was second only to football in terms of the sport in which the most such catastrophic events have occurred.[17]

41.     There is simply no good reason for the Defendants to have been unprepared for sudden cardiac events such as Zeke's, and for their failure to react quickly to save a life.  Had properly trained medical professionals administered expeditious and proper treatment, Zeke would still be alive.  Compare, for example, the response of team medical personnel during a NCAA basketball game in Raleigh, North Carolina, where a South Carolina State University player

---

[14] Peter Hess, *The NBA's Heart Disease Problem is a Race Issue, Say Doctors*, INVERSE.COM, Dec. 6, 2017, available at https://www.inverse.com/article/39070-nba-heart-disease-attack-black-athletes (last accessed May 29, 2018).

[15] Brent Edward, *Nearly 20% of NBA Players Have Heart Issues, Study Finds*, DIGITALCHEW.COM, Dec. 7, 2017, available at http://digitalchew.com/2017/12/07/nearly-20-of-nba-players-have-heart-issues-study-finds/ (last accessed May 29, 2018).

[16] Kristen L. Kucera, MSPH, Ph.D., ATC, et al., *Catastrophic Sports Injury Research: Thirty-Fourth Annual Report*, NATIONAL CENTER FOR CATASTROPHIC SPORT INJURY RESEARCH AT THE UNIVERSITY OF NORTH CAROLINA AT CHAPEL HILL, Oct. 5, 2017, at 4.

[17] *Id.*

collapsed but was then expeditiously treated and was eventually revived.[18]  While there is no perfect process, Ty Solomon, the player who was revived, is alive today likely because of the rapid response that occurred at the PNC arena by the team and medical staff.

42.    Zeke could have continued playing basketball professionally had he been properly treated on the evening of March 24, 2018, or properly diagnosed before that during his 2016 and 2017 pre-season screenings.  One need only look at the stories of professional players like Channing Frye, Ronny Turiaf, Etan Thomas, Chris Wilcox, and Jeff Green, all of whom have overcome serious heart ailments to continue playing in the NBA.[19]

43.    Zeke's compromised cardiac condition, of which the NBA, Pistons and SSJ knew or should have known, renders their conduct and unpreparedness all the more shocking.  In 2006, the NBA adopted a mandatory policy of annual pre-season screening of athletes, which included stress echocardiography, resting echocardiography, and an electrocardiogram, among other testing, before entrance into the league.  But the policy and required screening procedures would prove to be an utter sham.  Proof of this sham is not only found in the fact that Zeke Upshaw suffered sudden cardiac death just months after his purported screening, but is also found in Zeke's medical and autopsy records reflecting that Zeke had a diagnosable condition that should have been identified during the mandatory cardiac screening—cardiomyopathy.

44.    The NBA, Pistons, and SSJ required Zeke Upshaw to undergo two pre-season cardiac screenings and physicals on November 9, 2016 and October 30, 2017.  Purportedly as a

---

[18] Steve Wiseman, '*I Love Those Guys.' SC State Player Thankful for Those Who 'Literally Saved My Life*', THE NEWS & OBSERVER, Dec. 4, 2017, available at http://www.newsobserver.com/sports/college/acc/nc-state/state-now/article188015384.html (last accessed May 29, 2018).

[19] Associated Press, *For 4 NBA Players with Serious Heart Ailments, a Fraternity has Helped Get Them Through It*, Mar. 20, 2014, available at http://www.foxnews.com/sports/2014/03/20/for-4-nba-players-with-serious-heart-ailments-fraternity-has-helped-get-them.html (last accessed Sept. 3, 2018).

result of those screens, the NBA, Pistons and SSJ cleared Zeke Upshaw to play basketball, a decision that would ultimately end his life.

45.     Zeke should **never** have been cleared to play in the 2017-2018 season.  Zeke's preseason screening records reflect: "estimated ejection fraction is approximately 55 percent," "blood pressure response to exercise was hypertensive," "left atrium mildly dilated," "there was mild mitral valve regurgitation," "mild amount of tricuspid regurgitation," "sinus bradycardia," "fatigue," and **incorrectly** "normal wall thickness of left ventricle"; and, his autopsy records reflect arrhythmogenic left ventricular cardiomyopathy—a condition certainly not developed in the few months between the sham screening and Zeke's death.

46.     Zeke's pre-season screenings were grossly insufficient and riddled with signs, warnings and red flags that were completely and recklessly overlooked or intentionally concealed, which led to Zeke's untimely death.  Estimated ejection fraction in a professional athlete is not what should have been done in this situation, especially since 55% of ejection fraction (how much blood the heart is pumping out each beat) is considered the lowest level acceptable rate in a normal person, not a professional athlete.  Zeke's blood pressure was shown to spike and go into dangerous levels of hypertension during the exercise portion of his screen, yet, this was overlooked or concealed.  Zeke was found to have a left atrium that was dilated and mitral valve regurgitation, which leads to enlargement of the left ventricular wall and doesn't allow blood to properly move through the heart to the rest of the body.  This condition also leads to fatigue, which was also noted during his pre-season screening.

47.     Inexcusably, the NBA, Pistons and SSJ allowed Zeke to play even with credible evidence from Defendant-retained physicians of Zeke's clearly compromised cardiac health—all for the purpose of letting him play in the league.  The NBA, Pistons and SSJ group knew Zeke had

these conditions but they sat back, reaped the profits, and watched Zeke pour his blood, sweat and

tears into taking his team to the playoffs and without the knowledge that each shot he took, rebound

he made, and every opponent he defended, would be an exertion that could end his life—an

eventuality that was realized when Zeke suffered from a sudden and fatal cardiac event during the

final play of the last regular season game.

## COUNT I
### CAUSE OF ACTION AGAINST DEFENDANTS PISTONS AND SSJ
### (Negligence and Gross Negligence)

48.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs

as though fully set forth herein.

49.     Defendants Pistons and SSJ were negligent. Defendants Pistons and SSJ were

required to exercise the ordinary care, skill and ability which is exercised by NBA teams' staff in

the same or similar circumstances, and which is exercised by other major league professional sport

teams' staff to ensure that proper response time, treatment, procedures and equipment are used to

properly diagnose, treat, and prevent deaths like Zeke Upshaw's.

50.     Defendants Pistons and SSJ consciously failed to act when action was required;

specifically, Defendants Pistons and SSJ failed to exercise reasonable and ordinary care, skill and

ability and were, therefore, negligent and grossly negligent in treating Zeke Upshaw, in the

following manner, including but not limited to, the following:

     a.     Failing to adequately respond to and treat Zeke Upshaw;

     b.     Failing to take a complete and thorough medical history;

     c.     Failing to perform a complete and thorough physical examination;

     d.     Failing to use a defibrillator to resuscitate Zeke Upshaw;

     e.     Failing to perform CPR;

16

f.     Failing to select, screen, train, and employ only qualified personnel;

g.     Failing to enact and enforce all necessary policies and procedures to ensure player safety;

h.     Failing to have proper policies and procedures in place to detect players who could potentially suffer a sudden cardiac event;

i.     Failing to inform Zeke Upshaw about the scientific research on the risks of playing basketball with a heart condition and about anecdotal evidence from the former NBA players who suffered sudden cardiac events;

j.     Failing to warn Zeke Upshaw of the potential negative effects of playing with heart conditions;

k.     Failing to adequately address the continuing and prevalent risks of playing basketball with heart conditions and the likelihood of players suffering from sudden cardiac events;

l.     Undertaking a duty of care to the health and safety of team players but turning a blind eye to the risks of players playing with heart conditions and the likelihood they will suffer a potentially fatal sudden cardiac event;

m.     Failing to provide qualified and trained medical staff; and

n.     Any other act or omission determined during discovery.

51.     Defendants Pistons and SSJ failed in all respects to comply with the standard of care; they were, therefore, negligent in their responding to and treating Zeke Upshaw, which ultimately led to his untimely death.

52.     Defendants Pistons and SSJ failed either to implement effective policies and procedures or to ensure policies and procedures were being consistently followed and complied

with as those policies and procedures relate to responding to a sudden cardiac event during an NBA game.

53. Defendants Pistons and SSJ failed to implement appropriate and adequate training of staff to ensure that a sudden cardiac event during a game would be quickly and accurately recognized and appropriately addressed.

54. Defendants Pistons and SSJ are liable for the negligence of their employees, servants, staff and/or hired medical professionals *vis-à-vis* their actual employment, *respondeat superior,* ostensible agency, and/or other applicable theories.

55. As a direct and proximate result of Defendants Pistons' and SSJ's negligence and gross negligence, unskilled acts or omissions, and those employees of Defendants Pistons and SSJ, Zeke Upshaw suffered severe injuries and death, including but not limited to excruciating pain and suffering and a prolonged period of oxygen deprivation before his death, wage loss, and loss of earning capacity.

56. As a direct result of Defendants Pistons' and SSJ's negligence and the negligence of the employees, servants, staff, and/or hired medical professionals, the heirs at law of Zeke Upshaw have sustained injuries and damages, including but not limited to reasonable medical, hospital, funeral, burial expenses, loss of financial support, loss of future gifts, loss of training and guidance, and loss of society and companionship.

57. The joint and several negligence of all the above listed Defendants created a foreseeable risk of injury and death to Zeke Upshaw, as well as others similarly situated.

58. Defendants Pistons and SSJ had actual knowledge that a heart-related injury was certain to occur in Zeke Upshaw, and that without immediate attempts to revive Zeke with a

defibrillator or with CPR that Zeke would die, and yet these Defendants willfully disregarded that knowledge, resulting in Zeke's untimely and unfortunate death.

59.     As a direct and proximate result of the Pistons and SSJ's negligence and gross negligence, those Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law.

## COUNT II
### CAUSE OF ACTION AGAINST DEFENDANT DELTAPLEX
#### (Negligence and Gross Negligence)

60.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

61.     Defendant DeltaPlex was negligent.  Defendant DeltaPlex was required to exercise the ordinary care, skill and ability which is exercised by pro sports arenas around the country in the same or similar circumstances, and which is exercised by other major league professional sport teams' staff to ensure that proper response time, treatment, procedures and equipment is used to properly diagnose, treat, and prevent deaths like Zeke Upshaw's.

62.     Defendant DeltaPlex failed to exercise reasonable and ordinary care, skill and ability and was, therefore, negligent and grossly negligent in treating Zeke Upshaw, in the following manner, including but not limited to:

> a.     Failing to adequately respond to and treat Zeke Upshaw;
>
> b.     Failing to use a defibrillator to resuscitate Zeke Upshaw;
>
> c.     Failing to perform CPR;
>
> d.     Failing to select, screen, train, and employ only qualified personnel;
>
> e.     Failing to enact and enforce all necessary policies and procedures to ensure player safety;

19

      f.      Failing to provide qualified and trained medical staff; and

      g.     Any other act or omission determined during discovery.

63.    Defendant DeltaPlex failed in all respects to comply with the standard of care; it was, therefore, negligent in its responding to and treating Zeke Upshaw which ultimately led to his untimely death.

64.    Defendant DeltaPlex is liable for the negligence of its employees, servants, staff and/or hired medical professionals *vis-à-vis* their actual employment, *respondeat superior,* ostensible agency, and/or other applicable theories.

65.    As a direct and proximate result of Defendant DeltaPlex's negligence and gross negligence, unskilled acts or omissions, and those employees of Defendant DeltaPlex, Zeke Upshaw suffered severe injuries and death, including but not limited to excruciating pain and suffering and a prolonged period of oxygen deprivation before his death, wage loss, and loss of earning capacity.

66.    As a direct result of Defendant DeltaPlex's negligence and the negligence of the employees, servants, staff, and/or hired medical professionals, the heirs at law of Zeke Upshaw have sustained injuries and damages, including but not limited to reasonable medical, hospital, funeral, burial expenses, loss of financial support, loss of future gifts, loss of training and guidance, and loss of society and companionship.

67.    The joint and several negligence of Defendant DeltaPlex created a foreseeable risk of injury and death to Zeke Upshaw, as well as other similarly situated.

68.    Defendant DeltaPlex knew that without immediate attempts to revive Zeke with a defibrillator or with CPR that Zeke would die, and yet it willfully disregarded that knowledge, resulting in Zeke's untimely and unfortunate death.

69.     As a direct and proximate result of DeltaPlex's negligence and gross negligence, DeltaPlex is liable to Plaintiff for the full measure of damages allowed under applicable law.

**COUNT III**
**CAUSE OF ACTION AGAINST DEFENDANT**
**NATIONAL BASKETBALL ASSOCIATION**
**(Negligence and Gross Negligence)**

70.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

71.     Defendant NBA was negligent.  Defendant NBA was required to exercise the ordinary care, skill and ability which is exercised by professional sports organizations around the country in the same or similar circumstances, and which is exercised by other major league professional sport organizations to ensure that proper response time, treatment, procedures and equipment is used to properly diagnose, treat, and prevent deaths like Zeke Upshaw's.

72.     Defendant NBA consciously failed to exercise reasonable and ordinary care, skill and ability and was, therefore, negligent and grossly negligent in the death of Zeke Upshaw, in the following manner, including but not limited to:

      a.     Failing to adequately respond to and treat Zeke Upshaw;

      b.     Failing to take a complete and thorough medical history;

      c.     Failing to perform a complete and thorough physical examination;

      d.     Failing to use a defibrillator to resuscitate Zeke Upshaw;

      e.     Failing to perform CPR;

      f.     Failing to select, screen, train, and employ only qualified personnel;

      g.     Failing to enact and enforce all necessary policies and procedures to ensure player safety;

h.    Failing to have proper policies and procedures in place to detect players who could potentially suffer a sudden cardiac event;

i.    Failing to inform Zeke Upshaw about the scientific research on the risks of playing basketball with a heart condition and about anecdotal evidence from the former NBA players who suffered sudden cardiac events;

j.    Failing to warn Zeke Upshaw of the potential negative effects of playing with heart conditions;

k.    Failing to adequately address the continuing and prevalent risks of playing basketball with heart conditions and the likelihood of players suffering from sudden cardiac events;

l.    Undertaking a duty of care to the health and safety of NBA League players but turning a blind eye to the risks of players playing with heart conditions and the likelihood they will suffer a sudden cardiac event;

m.    Failing to provide qualified and trained medical staff; and

n.    Any other act or omission determined during discovery.

73.    Defendant NBA failed in all respects to comply with the standard of care; it was, therefore, negligent in responding to and treating Zeke Upshaw which ultimately led to his untimely death.

74.    Defendant NBA failed to either implement effective policies and procedures or failed to ensure policies and procedures were being consistently followed and complied with as those policies and procedures relate to responding to a sudden cardiac event during an NBA game.

75.    Defendant NBA failed to implement appropriate and adequate training of staff to ensure that a sudden cardiac event during a game would be quickly and accurately recognized and appropriately addressed.

76.    Defendant NBA failed to confirm each of its teams, including the NBA G League Grand Rapids Drive, had adequate training, policies, and support to quickly and appropriately respond to a sudden cardiac event during an NBA game.

77.    Defendant NBA is liable for the negligence of its employees, servants, staff and/or hired medical professionals *vis-à-vis* their actual employment, *respondeat superior,* ostensible agency, and/or other applicable theories.

78.    As a direct and proximate result of Defendant NBA's negligence and gross negligence, unskilled acts or omissions, and those employees of Defendant NBA, Zeke Upshaw suffered severe injuries and death, including but not limited to excruciating pain and suffering and a prolonged period of oxygen deprivation before his death, wage loss, and loss of earning capacity.

79.    As a direct result of Defendant NBA's negligence and the negligence of its employees, servants, staff, and/or hired medical professionals, the heirs at law of Zeke Upshaw have sustained injuries and damages, including but not limited to reasonable medical, hospital, funeral, burial expenses, loss of financial support, loss of future gifts, loss of training and guidance, and loss of society and companionship.

80.    The joint and several negligence of Defendant NBA created a foreseeable risk of injury and death to Zeke Upshaw, as well as others similarly situated.

81.    Defendant NBA had actual knowledge that a heart-related injury was highly likely to occur in Zeke Upshaw, and that without immediate, medically adequate attempts to revive Zeke with a defibrillator or with CPR, Zeke was certain to die, and yet Defendant NBA willfully

23

disregarded that knowledge, either directly or vicariously through its actions and inactions, resulting in Zeke's untimely and unfortunate death.

82.     As a direct and proximate result of the NBA's negligence and gross negligence, the NBA is liable to Plaintiff for the full measure of damages allowed under applicable law.

## COUNT IV
## CAUSE OF ACTION AGAINST DEFENDANTS
## NATIONAL BASKETBALL ASSOCIATION,
## DETROIT PISTONS BASKETBALL COMPANY, and SSJ GROUP, LLC
### (Negligent Misrepresentation by Omission)

83.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

84.     A special relationship existed between the NBA, Pistons, SSJ and Zeke Upshaw which was significant enough to impose a duty on those Defendants to disclose accurate information to Zeke Upshaw. This duty arose because: (1) the NBA, Pistons and SSJ had superior knowledge of material medical information that players did not have access to, and was not readily available to players; and (2) the NBA, Pistons and SSJ, in their communications with players and the public, completely omitted material information about the true risks of sudden cardiac events, or provided partial or ambiguous statements regarding safety and sudden cardiac events, and the context of those communications shows that the NBA, Pistons and SSJ needed to complete or clarify those statements with all material information.

85.     Despite their knowledge of such material facts, and generally speaking about cardiac problems, the NBA, Pistons and SSJ negligently failed to disclose material information to their players regarding the link between cardiological issues while playing in the NBA and the possibility of suffering from a sudden cardiac event.

86.     The NBA, Pistons and SSJ actively omitted true information at a time when they knew, or should have known, because of their superior position of knowledge, that Zeke Upshaw faced serious and deadly health problems if he played with a heart condition and no proper response measures were in place to treat Zeke Upshaw when he suffered the foreseeable sudden cardiac event.

87.     Zeke Upshaw justifiably relied on the negligent misrepresentations by omission of the NBA, Pistons and SSJ to his detriment, relying on what those Defendants said and failed to say to him about cardiac conditions and the possibility of suffering a sudden cardiac event.

88.     Zeke Upshaw's reliance on the Defendants' negligent misrepresentations by omission was reasonable, given the NBA's superior and unique vantage point on these issues.

89.     Had Zeke Upshaw been aware of such information, he would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and had the proper precautions in place before returning to play.

90.     The NBA, Pistons and SSJ consciously failed to act with reasonable care by negligently failing to disclose material information to Zeke Upshaw regarding the link between fatal heart conditions and professional basketball players.

91.     As a direct and proximate result of the negligent misrepresentations by omission by the NBA, Pistons and SSJ, Zeke Upshaw suffered a sudden cardiac event resulting in his untimely death.

92.     As a direct and proximate result of the NBA's, Pistons' and SSJ's negligence, those Defendants are liable to Plaintiff for the full measure of damages allowed under applicable law.

### COUNT V
### CAUSE OF ACTION AGAINST DEFENDANTS
### NATIONAL BASKETBALL ASSOCIATION,
### DETROIT PISTONS BASKETBALL COMPANY, and SSJ GROUP, LLC

**(Fraudulent Concealment)**

93.     Plaintiff incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

94.     The NBA, Pistons, and SSJ knowingly and fraudulently concealed from Zeke Upshaw material information regarding the risks of suffering a sudden cardiac event while playing in the NBA.

95.     The NBA, Pistons, and SSJ knew, intended to induce reliance upon and expected Zeke Upshaw would reasonably rely on their silence and fraudulent concealment of the risks and the likelihood he would suffer from a sudden cardiac event while playing in the NBA.

96.     Zeke Upshaw reasonably relied on that silence during his career in the NBA, to his detriment.

97.     The NBA, Pistons, and SSJ required Zeke Upshaw to undergo two pre-season cardiac screenings and physicals on November 9, 2016 and October 30, 2017. During these screenings, Zeke Upshaw showed clear signs of cardiac issues and fatigue that could jeopardize his health and cause serious, and even fatal, injuries. These issues were knowingly, purposefully, and intentionally not explained to Zeke Upshaw in order to prevent him from forming his own conclusions about playing with heart issues or allowing him to seek his own medical advice relating to his conditions.

98.     In addition, or in the alternative, the NBA, Pistons, and SSJ cleared Zeke Upshaw to play after Zeke Upshaw underwent the pre-season cardiac screenings and physicals based on Defendants' knowing, purposeful and intentional alteration of the screening criteria and standards for cardiac health in favor of passing players, which altered criteria and standards the NBA, Pistons and SSJ knowingly and intentionally concealed from and failed to disclose to Zeke Upshaw.

99.      In addition, or in the alternative, the NBA, Pistons, and SSJ pass through the cardiac screening players like Zeke Upshaw, who are adamant about playing and/or are leading scorers on the team because the NBA, Pistons, and SSJ, driven by profit, want players like Zeke Upshaw, who are talented and driven, to be on the court for every play, no matter the health concerns.  In doing so, the NBA, Pistons, and SSJ knowingly, purposefully and intentionally conceal the risks identified in the cardiac screening from players like Zeke Upshaw, for the purpose of inducing players like Zeke Upshaw to continue playing and generating profits.

100.     The NBA's, Pistons', and SSJ's actions and omissions were committed with deliberate or reckless disregard of Zeke Upshaw's health and safety, in order to keep him in the dark about the dangers of playing with heart conditions which could, and did, lead to him suffering a sudden cardiac event and death.

101.     Had Zeke Upshaw been aware of such information he would have ensured that he received appropriate medical treatment and response in the event he suffered from sudden cardiac event, and ensured that he was completely healthy before returning to play.

102.     As a direct and proximate result of the NBA's, Pistons', and SSJ's fraudulent concealment, Zeke Upshaw suffered serious injuries which led to his untimely death.

103.     Defendants NBA, Pistons and SSJ had actual knowledge that a heart-related injury was certain to occur in Zeke Upshaw, and that without immediate attempts to revive Zeke with a defibrillator or with CPR that Zeke would pass away, and yet these Defendants willfully disregarded that knowledge, resulting in Zeke's untimely and unfortunate death.

104.     As a direct and proximate result of the NBA's, Pistons', and SSJ's misconduct, the NBA, Pistons, and SSJ are liable to Plaintiff for the full measure of damages allowed under applicable law.

## COUNT VI
### CAUSE OF ACTION AGAINST DEFENDANTS
### NATIONAL BASKETBALL ASSOCIATION,
### DETROIT PISTONS BASKETBALL COMPANY, and SSJ GROUP, LLC
### (Fraud by Omission / Failure to Warn)

105. Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

106. The NBA, Pistons, and SSJ had a duty to promptly disclose and speak the full truth regarding the health risks caused by playing basketball with heart conditions. This duty arose because: (1) the NBA, Pistons, and SSJ had superior and special knowledge of material medical information that Zeke Upshaw did not have access to, and was not readily available to players; and (2) the NBA, Pistons, and SSJ, in their communications with players and the public, completely omitted material information about the true risk of fatal cardiac events in professional athletes, or provided partial or ambiguous statements regarding cardiac injuries, and the context of those communications shows that the NBA, Pistons, and SSJ needed to complete or clarify those statements with material information.

107. The NBA, Pistons, and SSJ breached that duty by fraudulently failing to disclose material information to Zeke Upshaw regarding the likely risks of suffering a fatal sudden cardiac event while playing in the NBA.

108. Specifically, the NBA, Pistons, and SSJ concealed material facts and information with the effect of evading the truth, which caused Zeke Upshaw to become exposed to the harm referenced above.

109. The NBA, Pistons, and SSJ required Zeke Upshaw to undergo two pre-season cardiac screenings and physicals on November 9, 2016 and October 30, 2017. During these screenings, Zeke Upshaw showed clear signs of cardiac issues and fatigue that could jeopardize

his health and cause serious, and even fatal, injuries.  The NBA, Pistons and SSJ intentionally failed to disclose this information to Zeke Upshaw and intentionally failed to warn him of the risks associated with the cardiac findings made during Zeke's screenings.  The findings from Zeke Upshaw's cardiac screenings were knowingly, purposefully, and intentionally not explained to Zeke Upshaw in order prevent him from forming his own conclusions about playing with heart issues or allowing him to seek his own medical advice relating to his conditions.

110.    In addition, or in the alternative, the NBA, Pistons, and SSJ cleared Zeke Upshaw to play after Zeke Upshaw underwent the pre-season cardiac screenings and physicals based on Defendants' knowing, purposeful and intentional alteration of the screening criteria and standards for cardiac health in favor of passing players, which altered criteria and standards the NBA, Pistons and SSJ knowingly and intentionally failed to disclose to Zeke Upshaw and about which they intentionally failed to warn.

111.    In addition, or in the alternative, the NBA, Pistons, and SSJ pass through the cardiac screening players like Zeke Upshaw, who are adamant about playing and/or are leading scorers on the team because the NBA, Pistons, and SSJ, driven by profit, want players like Zeke Upshaw, who are talented and driven, to be on the court for every play, no matter the health concerns.  In doing so, the NBA, Pistons, and SSJ knowingly, purposefully and intentionally conceal the risks identified in the cardiac screening from players like Zeke Upshaw, for the purpose of inducing players like Zeke Upshaw to continue playing and generating profits.

112.    Zeke Upshaw justifiably relied on the NBA's, Pistons', and SSJ's fraudulent omissions to his detriment.

113.    Given the NBA's, Pistons', and SSJ's superior and special knowledge and resources, Zeke Upshaw reasonably relied on the NBA, Pistons, and SSJ for guidance on cardiac

issues through the NBA's cardiac screening protocol, and reasonably relied upon NBA's fraudulent omissions of material fact, which concealed and minimized the perceived risks of suffering a sudden cardiac event while playing in the NBA.

114.   Had Zeke Upshaw been aware of such information he would have ensured that he received appropriate medical treatment, an appropriate medical response in the event he suffered a sudden cardiac event, and made sure he was completely healthy before returning to play.

115.   As a direct and proximate result of the NBA's, Pistons', and SSJ's fraud by omission and failure to warn, Zeke Upshaw suffered serious life-threatening injuries in the form of a sudden cardiac event that was not properly responded to and led to his untimely death.

116.   As a direct and proximate result of the NBA's, Pistons', and SSJ's misconduct, the NBA is liable to Plaintiff for the full measure of damages allowed under applicable law.

<u>COUNT VII</u>
**CAUSE OF ACTION AGAINST DEFENDANTS
NATIONAL BASKETBALL ASSOCIATION,
DETROIT PISTONS BASKETBALL COMPANY, and SSJ GROUP, LLC
(Intentional Misrepresentation)**

117.   Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

118.   A special relationship existed between the NBA, Pistons, SSJ and Zeke Upshaw which was significant enough to impose a duty on the NBA, Pistons, and SSJ to disclose accurate information to Zeke Upshaw. This duty arose because: (1) the NBA, Pistons, and SSJ had superior knowledge of material medical information that players did not have access to, and was not readily available to players; and (2) the NBA, Pistons, and SSJ, in their communications with players and the public, completely omitted material information about the true risks of sudden cardiac events, or provided partial or ambiguous statements regarding safety and sudden cardiac events, and the

30

context of those communications shows that the NBA, Pistons, and SSJ needed to complete or clarify those statements with all material information.

119.    Despite their knowledge of such material facts, and generally speaking about cardiac issues surrounding the NBA and current and former players, the NBA, Pistons, and SSJ intentionally omitted and failed to disclose material information to their players, namely Zeke Upshaw, regarding the link between cardiological issues while playing in the NBA and the possibility of suffering a sudden cardiac event.

120.    The NBA, Pistons, and SSJ actively and intentionally omitted true information at a time when they knew, or should have known, because of their superior position of knowledge, that Zeke Upshaw faced serious and deadly health consequences and injuries if he played with a heart condition and no proper response measures were in place to treat Zeke Upshaw when he suffered the foreseeable sudden cardiac event.

121.    The NBA, Pistons, and SSJ knowingly and recklessly made material misrepresentations to Zeke Upshaw. Zeke Upshaw justifiably relied on the NBA's, Pistons', and SSJ's intentional misrepresentations to his detriment, relying on what the NBA said to him about his cardiac health and the safety of continuing to play basketball with a cardiac condition.

122.    The NBA, Pistons, and SSJ required Zeke Upshaw to undergo two pre-season cardiac screenings and physicals on November 9, 2016 and October 30, 2017.  During these screenings, Zeke Upshaw showed clear signs of cardiac issues and fatigue that could jeopardize his health and cause serious, and even fatal, injuries.  The NBA, Pistons and SSJ intentionally misrepresented the results of Zeke Upshaw's pre-season cardiac screening to him and/or intentionally misrepresented the risks of continuing to play in the league given those results.

31

123.    In addition, or in the alternative, the NBA, Pistons, and SSJ cleared Zeke Upshaw to play after Zeke Upshaw underwent the pre-season cardiac screening and physical because the NBA, Pistons, and SSJ based on Defendants' knowing, purposeful and intentional alteration of the screening criteria and standards for cardiac health in favor of passing players.  In doing so, the NBA, Pistons and SSJ intentionally misrepresented the true state of Zeke Upshaw's cardiac health and the risk to Zeke of continuing to play without cardiac intervention, by clearing Zeke Upshaw to play based on altered cardiac health criteria and standards.

124.    In addition, or in the alternative, the NBA, Pistons, and SSJ pass through the cardiac screening players like Zeke Upshaw, who are adamant about playing and/or are leading scorers on the team because the NBA, Pistons, and SSJ, driven by profit, want players like Zeke Upshaw, who are talented and driven, to be on the court for every play, no matter the health concerns.  In doing so, the NBA, Pistons, and SSJ knowingly, purposefully and intentionally misrepresented the risks identified in the cardiac screening, and of continuing to play basketball despite the cardiac findings, for the purpose of inducing players like Zeke Upshaw to continue playing and generating profits, despite undertaking a duty of care to the health and safety of NBA League players. Zeke Upshaw's reliance on the NBA's, Pistons', and SSJ's intentional misrepresentations was reasonable, given the NBA's, Pistons', and SSJ's superior and unique vantage point on these issues.

125.    Had Zeke Upshaw been aware of the actual truth regarding the NBA's, Pistons', and SSJ's intentional misrepresentations, Zeke Upshaw would have ensured that he received appropriate medical treatment and ensured that he was completely healthy and had the proper precautions in place before returning to play.

32

126.     The NBA, Pistons, and SSJ intentionally misrepresented Zeke Upshaw's medical condition. The NBA, Pistons, and SSJ knew that Zeke Upshaw suffered from cardiac issues and the NBA, Pistons, and SSJ knew the likelihood of Zeke Upshaw suffering from a sudden cardiac event.  The NBA, Pistons, and SSJ failed to alert Zeke Upshaw about his condition and/or made intentional misrepresentations to him about his cardiac health, which representations in fact were not true.

127.     As a direct and proximate result of the NBA's, Pistons', and SSJ's intentional misrepresentations, Zeke Upshaw suffered a sudden cardiac event resulting in his untimely death.

128.     As a direct and proximate result of the NBA's, Pistons', and SSJ's intentional and reckless conduct, the NBA, Pistons, and SSJ are liable to Plaintiff for the full measure of damages allowed under applicable law.

**COUNT VIII**
**CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Wrongful Death and Exemplary Damages)**

129.     Plaintiff hereby incorporates the allegations contained in the preceding paragraphs as though fully set forth herein.

130.     Plaintiff asserts this cause of action pursuant to § 600.2922 Mich. Comp. Laws for the wrongful death of her son, Zeke Upshaw. Defendants' wrongful acts, neglect, fraud, omissions, misrepresentations, failures and fault relating to the care and treatment of Zeke Upshaw and to the policies, procedures, actions and responses regarding cardiac health and sudden cardiac events in NBA players  caused Zeke Upshaw's untimely death, and if the Defendants had not acted in such a wrongful, negligent, reckless or intentional manner, Zeke Upshaw's death would not have occurred.

131.     As a direct and proximate result of the willful, wrongful, negligent, intentional, reckless and/or malicious acts of the Defendants, Zeke Upshaw died an untimely death. As a result of the breaches of the standard of care and failure to adequately respond, treat and render care as previously set forth and as a result of the Defendants' fraud, omissions, misrepresentations and failure to warn regarding the risk of a sudden cardiac event and of Zeke Upshaw's cardiac condition, Zeke Upshaw died on March 26, 2018.

132.     Plaintiff, Jewel Upshaw, is the mother of decedent Zeke Upshaw and is the Representative for his Estate.

133.     The aforesaid negligence, breaches of the standard of care, and failure to adequately respond, treat and care for Zeke Upshaw, have proximately caused damages to the Estate of Zeke Upshaw, Deceased, and the beneficiaries of the Estate of Zeke Upshaw, including Plaintiff Jewel Upshaw, Zeke Upshaw's mother, and Zena Reynolds, Zeke Upshaw's father.

134.     The aforesaid fraud, omissions, negligent and intentional misrepresentations, and failure to warn have proximately caused damages to the Estate of Zeke Upshaw, Deceased, and the beneficiaries of the Estate of Zeke Upshaw, including but not limited to:

a.     The death of Zeke Upshaw;

b.     Conscious pain and suffering;

c.     Loss of society and companionship;

d.     Pain, suffering, emotional distress, past, present and future;

e.     Humiliation, mortification, fright, past, present and future;

f.     Medical expenses;

g.     Lost wages, compensation, and earning capacity, past present and future;

h.     Emotional and mental suffering, past, present and future;

i.      Loss of enjoyment of life, past, present and future;

j.      Attorney fees and legal costs; and

k.      Any and all other injuries and damages found to be appropriate by the trier of fact.

135.    As a direct and proximate result of the Defendants' conduct, actions and omissions, which caused the wrongful death of Zeke Upshaw, Plaintiff seeks the full measure of damages allowed under applicable law, including exemplary damages.

### COUNT IX
**CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Intentional Infliction of Emotional Distress: Bystander Recovery)**

136.    Plaintiff restates each and every allegation set forth above as though fully incorporated herein.  Plaintiff brings a bystander claim on behalf of Plaintiff Jewel Upshaw for Intentional Infliction of Emotional Distress.

137.    Plaintiff Jewel Upshaw is the mother of Zeke Upshaw, who was severely injured on March 24, 2018 and ultimately died on March 26, 2018 as a result of his injuries, as set forth above.

138.    Jewel Upshaw was watching a live stream video broadcast of Zeke's basketball game on March 24, 2018, when she heard the commentator exclaim that Zeke fell.  Others watching the live stream began to comment on Zeke's condition.  Upon watching, reading, and hearing, in real time, that her son fell to the court, Jewel Upshaw began to panic over her son's condition.  She began screaming "Nooo!" and proclaiming aloud to herself, "He's not moving!"  Ms. Upshaw perceived the event as it happened and the shock that Jewel Upshaw experienced occurred contemporaneously with the incident that ultimately took Zeke Upshaw's life.

139.    As set forth above, Defendants' conduct was the direct and proximate cause of Zeke Upshaw's injuries, and the shock that Jewel Upshaw suffered, contemporaneously with hearing about his injuries as they occurred, caused Ms. Upshaw actual physical harm. As a direct and proximate result of Defendants' conduct, Jewel Upshaw sustained great emotional disturbance and shock and injury to the nervous system, resulting in: loss of weight; inability to perform ordinary household duties; extreme nervousness; irritability; depression; loss of sleep; listlessness; withdrawal from normal forms of socialization; great sense of personal loss; anxiety; sleeplessness, and inability to concentrate.

140.    As a direct and proximate result of Defendants' conduct and the emotional trauma and damage to Jewel Upshaw's nervous system from perceiving first-hand Zeke Upshaw's injuries, Jewel Upshaw suffered and will continue to suffer pain and physical disability.

141.    Zeke's injuries were of a nature to cause severe mental disturbance to his family, including his mother. Specifically, as detailed herein, Zeke suffered a fatal cardiac event during an NBA-sanctioned basketball game. Defendants' conduct as detailed herein, proximately caused Zeke's injuries, and was intentional and/or reckless, odious, perverse and outrageous.

142.    Defendants' conduct, as detailed herein, was so outrageous in character, and extreme in degree, so as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society.

143.    As a further direct and proximate result of such injuries, Jewel Upshaw has incurred and will incur damages, obligations and medical expenses in an amount that exceeds the jurisdictional limits of this Court.

<u>COUNT X</u>
**CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**(Negligent Infliction of Emotional Distress: Bystander Recovery)**

144.     Plaintiff restates each and every factual allegation set forth above as though fully incorporated herein.  In the alternative, Plaintiff brings a bystander claim on behalf of Plaintiff Jewel Upshaw for Negligent Infliction of Emotional Distress.

145.     Plaintiff Jewel Upshaw is the mother of Zeke Upshaw, who was severely injured on March 24, 2018 and ultimately died on March 26, 2018 as a result of his injuries, as set forth above.

146.     Zeke's injuries were of a nature to cause severe mental disturbance to his family, including his mother.  Specifically, as detailed herein, Zeke suffered a sudden and fatal cardiac event during an NBA basketball game.

147.     Jewel Upshaw was watching a live stream video broadcast of Zeke's basketball game on March 24, 2018, when she heard the commentator exclaim that Zeke fell.  Others watching the live stream began to comment on Zeke's condition.  Upon watching, reading, and hearing, in real time, that her son fell to the court, Jewel Upshaw began to panic over her son's condition.  She began screaming "Nooo!" and proclaiming aloud to herself, "He's not moving!"  Ms. Upshaw perceived the event as it happened and the shock that Jewel Upshaw experienced occurred contemporaneously, with the incident that ultimately took Zeke Upshaw's life.

148.     As set forth above, Defendants' conduct was the direct and proximate cause of Zeke Upshaw's injuries, and the shock that Jewel Upshaw suffered, contemporaneously with hearing about his injuries as they occurred, caused Ms. Upshaw actual physical harm.  As a direct and proximate result of Defendants' conduct, Jewel Upshaw sustained great emotional disturbance and shock and injury to the nervous system, resulting in: loss of weight; inability to perform ordinary

household duties; extreme nervousness; irritability; depression; loss of sleep; listlessness; withdrawal from normal forms of socialization; great sense of personal loss; anxiety; sleeplessness, and inability to concentrate.

149.    As a direct and proximate result of Defendants' conduct and the emotional trauma and damage to Jewel Upshaw's nervous system from perceiving first-hand Zeke Upshaw's injuries, Jewel Upshaw suffered and will suffer pain and physical disability.

150.    As a further direct and proximate result of such injuries, Jewel Upshaw has incurred and will incur damages, obligations and medical expenses in an amount that exceeds the jurisdictional limits of this Court.

## DEMAND FOR JURY TRIAL

151.    Plaintiff demands a jury trial for all claims so triable.

## PRAYER

**WHEREFORE,** Plaintiff, Jewel Upshaw, Individually and on Behalf of the Estate of Zena "Zeke" Upshaw, Deceased, respectfully prays for judgment against all Defendants in an amount to be determined by the trier of fact for her losses as well as the Estate's losses, damages and harm, economic and noneconomic, for exemplary and statutory damages, and for all costs, attorneys' fees, expert witness fees, filing fees, pre- and post-judgment interest, and such other further relief as the Court may deem appropriate, just, and proper.

Dated: October 22, 2018               **Respectfully Submitted,**

                                      **HILLIARD MARTINEZ GONZALES, LLP**

                                      By: /s/ *Robert C. Hilliard*
                                      Robert C. Hilliard
                                      Texas State Bar No. 09677700
                                      Federal ID No. 5912

bobh@hmglawfirm.com
719 S. Shoreline Blvd.
Corpus Christi, TX  78401
Telephone No.: (361) 882-1612
Facsimile No.: (361) 882-3015

-and-

**MORGAN & MEYERS, PLC**

COURTNEY E. MORGAN JR.  (P29137)
3200 Greenfield Road, Suite 260
Dearborn, MI  48120
(313) 961-0130/(313) 961-8178 fax
cmorgan@morganmeyers.com

Of Counsel:
**BEN CRUMP LAW, PLLC**

Ben Crump
Florida State Bar No. 72583
court@bencrump.com
122 S. Calhoun Street
Tallahassee, FL  32301
Telephone No.: (850) 224-2020

*ATTORNEYS FOR PLAINTIFF*